APPENDIX  I

April 27, 2006                                    VIA E-mail

McDonough, Hacking & Lavoie, LLP
6 Beacon St.
Suite 815
Boston, MA 02108

Re: Lorenzo Guarino v. R. W. Granger & Sons, Inc. v.
Scavone C&M Construction Co., Inc.

Dear Mr. Lavoie:

As requested, I have reviewed material presented to me on this case which
consisted of the following:

    Scavone Contract for the Project
    Fenestration Contract for the Project
    Weekly Meeting Minutes for 1/15/02 through 2/5/02
    Superintendent's Daily Reports for 1/2/02 through 2/7/02
    Deposition of the Plaintiff
    Deposition of Ernest O'Brien
    Deposition of Alvin DuPont
    Deposition Exhibits

It is my understanding that the accident involving Mr. Guarino occurred on 2/5/02
as he was employed by Fenestration Architectural Products, Inc. and assigned
the task of assisting moving window wall product from the delivery truck to a
location next to the building. While engaged in this activity, Mr. Guarino allegedly
tripped on a 10 ft. x 20 ft. piece of welded wire mesh on the ground injuring his
foot when it struck a pipe on the ground.

Based on the above testimony and documents, I have arrived at the following
opinions:

1.    It is accepted and common practice to locate welded wire mesh used
      for concrete reinforcing in a flat position on the ground.

2.    Fenestration Architectural Products, Inc., the employer of Mr. Guarino,
      chose the path of travel from the delivery vehicle to the storage
      location without taking into account the potential hazard presented to
      Mr. Guarino by the stored reinforcing mesh which was located on the
      ground. Available information, including photographs, indicate a safe
      path of travel was readily available had Mr. Guarino's Foreman, who
      was driving the Lull forklift, chosen to take it.

3.    Fenestration Architectural Products, Inc., as Mr. Guarino's employer
      has the primary responsibility under the Occupational Safety and
      Health Act of 1970, Public Law 91-596 Section 5 (A)(1) for his
      personal safety.

Section 5 (A)(1) states, " Each employer shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees." Available information indicates that Fenestration was aware of the ground conditions near the building and failed to take corrective actions.

4.  Mr. Guarino failed to exercise due caution when walking on the construction site. Good and acceptable construction practices require awareness of ground conditions in both walking and working areas. It is each employee's responsibility to be aware of ground conditions, location of stored material and debris to enable a choice of a safe path of travel. Mr. Guarino claims to have tripped on a 10 ft. x 20 ft. piece of welded wire mesh that is commonly used for concrete reinforcement.

5.  It is my opinion that upon review of information presently available, including the contract between Scavone and Granger, that Scavone was not responsible for providing the welded wire mesh used for concrete reinforcement and was only responsible for placing and finishing the concrete slabs. Available information suggests Scavone was not present on the construction site for over two weeks prior to the accident and that Scavone was never placed on notice nor cited by Granger for unsafe or improper storage or debris.

6.  It is my opinion based on my years of experience within the construction industry that the General Contractor, in this case R. W. Granger & Sons, Inc. (Granger), has the responsibility for maintaining a project site that has materials stored in an orderly manner, debris disposed of in a safe and orderly manner and that walking and working areas are safe for workers to travel. Based on information currently available, Granger deviated from good and acceptable construction practice by failing to ensure subcontractors were provided a safe access to work areas in the area of the accident.

Based on the information currently reviewed, the above are my opinions presently held in this case. Please feel free to contact me should additional facts need to be reviewed.

Yours truly,

John P. O'Donovan, P.E., CSHM

APPENDIX  IA

# John P. O'Donovan

**124 Tallman Avenue**
**Cranston, Rhode Island 02910**
**(401) 781-8034 (residence) Fax (401) 941-5247**
**Cell phone (401) 529-6648**

## EXPERIENCE

Current employment: since September 1980, Corporate Safety Director of Gilbane Building Co., a $2.5 Billion nation-wide construction firm. Responsible for company-wide safety including subsidiaries. Overall direction of all safety professionals within company and over 16,000 construction employees. Responsible for lowering insurance EMR from 2 to 0.34. Construction activity primarily commercial and industrial.

Previous employment: 7 years as Regional Safety Director for Eastern Region of the Turner Construction Co., about $1 billion of construction per year in the region.

Prior: served 3 years with the National Safety Council as construction staff representative as well as Secretary of American National Standards A10 Committee on Safety in Construction and Demolition Operations.

## EDUCATION

Bachelor of Science in Civil Engineering
Professional Engineer, Safety, California Registration #3072
Certified Safety and Health Manager

## PROFESSIONAL ORGANIZATIONS

Associated General Contractors of America
　　National Safety Engineers Advisory Committee Member 1980-00.
　　Rhode Island Safety Committee Chairman 1980-85, current member
　　Massachusetts Safety Committee Chairman 1988-89, current member.
National Center for Construction Safety and Research
　　Chairman, National Safety Committee 1996-98
National Construction Safety Executives, various officer positions
National Safety Council Construction Executive Committee; General Chairman 1987-88,
National Safety Management Association, member
American Society of Safety Engineers, professional member
American National Standards Institute
　　Chairman A10.32 Fall Protection; member A10.33 Model Safety Programs,
　　A10.13 Floor and Wall Openings, A10.14 Job Made Ladders.
Member OSHA SENRAC (Steel Erection Negotiated Rulemaking) Committee
Construction Management Association of America, Chairman Safety Committee 1998-2000
Institute for Safety and Health Management

## EXPERT

Qualified Expert in Massachusetts, Connecticut and Rhode Island courts

Construction Safety

## Cases resulting in either trial and/or deposition:

Trial and deposition - Barry R. Hall v. Cape Associates - Cape Cod, Ma.
Trial and deposition - Ybarra v. Regency Builders - RI Superior Court, Providence, RI
Trial and deposition - Joan Hitchcock v. O & G Industries - Waterbury, Ct.
Deposition - John Doe Jr. PPA v. Shop Rite Supermarkets - Hartford, Ct.
Trial - Johnson v. Modern Continental Construction Co. – Suffolk – Boston, MA
Trial - Daniel Isabarrone v. Modern Continental Construction Co. - Cambridge, Ma.
Deposition – Boyce v. EDIS/Bellvue Holding v. Falcon Steel – Wilmington, DE
Trial – Ferguson v. Algonquin Builders (Marshall), Superior Court., Providence, RI
Trial – SantaMarie v. Dacon, Suffolk, Boston, MA.
Trial and Deposition – Rodriguez v. Spino Brothers, Superior Court, Providence, RI
Deposition and testimony at Arbitration Russell v. Endicott, Kansas City MO
Trial and Deposition, Laftsidis v. Shawmut Woodworking and Supply

Date Reviewed 2/06

APPENDIX  II

NORMAN C. HURSH, Sc.D.
Rehabilitation Psychologist

9 JEFFREY CIRCLE
BEDFORD, MASSACHUSETTS 01730

781/275-1545

April 27, 2006

Mark B. Lavoie, Esquire
McDonough, Hacking & Lavoie, LLC
6 Beacon Street, Suite 815
Boston, Massachusetts 02108

Re:    Lorenzo Guarino

Dear Mr. Lavoie:

After reviewing the limited records available to me, this report summarizes my preliminary opinions on the vocational potential, employability, and earning capacity of Mr. Lorenzo Guarino. I base my opinions on review of available records and materials including Mr. Guarino's deposition, Sturdy Hospital records, Physician reports, diagnostic reports, and expert depositions. In addition, I relied on my education, training, and experience in the field of vocational rehabilitation.

**Education and Work History**. Mr. Guarino is a 44 year old (DOB 3/17/62) married man who is currently living in Pawtucket, Rhode Island. Mr. Guarino grew up in Rhode Island and attended the Mr. Pleasant High School. He left school in the 12th grade and attended the William Davies Career and Vocational Technical School in Lincoln, RI. He graduated with training in Culinary Arts and obtained his GED in 1986. Mr. Guarino has had no additional training and has not sought further training since his injury in February 2002. No evaluations or assessments have been conducted to evaluate functional academic skills and no records are available about his academic performance.

After graduating from the William Davies Vocational Technical High School, Mr. Guarino worked as a cook for approximately 13 years. No information is available about the type of employment he was involved in or the characteristics of the cafeteria or restaurant in which he worked. In general, a Cook (DOT #313.361-014) may work in different restaurants or cafeterias ranging from family or fast food, to formal restaurants or establishments in business settings. He would prepare, season, and cook soups, meats, vegetables, desserts, and other foods. He would read a menu to estimate food requirements and maybe order food from different suppliers. As a cook, Mr. Guarino would measure and mix ingredients according to a recipe, using a variety of kitchen utensils and equipment, such as blenders, mixers, grinders, slicers, and tenderizers to prepare different soups, salads, desserts, sauces, and casseroles. He would use different cooking process to bake, roast, broil, and cook meats, fish, vegetables, and other foods. Mr. Guarino would add seasoning to foods during the mixing or cooking, according to personal judgment and

*Vocational Rehabilitation Services, Consultation and Training*

his own experience. He also might bake bread, rolls, cakes, and pastries. A cook is typically classified as a skilled position that requires Medium physical demands.

After working as a cook, Mr. Guarino worked for a company owned by his brother-in-law and learned the glazier trade. He worked at this company for a short time before taking a job as a glazier for A & A Vinyl in Johnston, RI for approximately one year. Mr. Guarino then joined the International Brotherhood of Painting and Allied Trades, Local 1333, as a glazier and worked for several companies installing glass in commercial construction jobs, including A & A Glass in Hopkington, MA and Ipswich Bay Glass in Ipswich, MA. He worked as a union glazier for approximately 3-4 years before he worked for Fenestration Architectural Products, LLC on a construction site at the Old Rochester Junior Senior High School in Marion, MA. He had been working for Fenestration for approximately 5 months and was installing glass, framework, rubber sealers, and glazing when he was injured on the job in February 2002. He apparently has not returned to work since the date of his injury.

As a union Glazier (DOT #865.381-010), Mr. Guarino installed glass in windows or on surfaces such as building fronts, interior walls, and ceilings. He marked the outline or pattern on glass, and cut the glass, using a glasscutter, breaking off excess glass by hand or with a notched tool. He then fastened the glass panes into the wood sash with glazier's points, and spread and smoothed putty around the edge of panes with a knife to seal joints. He might install metal windows and door frames into which glass panels are to be fitted. Glaziers are skilled trades and involve Medium physical demands.

Mr. Guarino has not returned to work as a union glazier. Apparently, Mr. Guarino has not sought other work and has not contacted vocational rehabilitation professionals about sedentary or light vocational options, and has not sought information about vocational rehabilitation services available to him. He has maintained his union membership.

At the time of his deposition in January 2005, Mr. Guarino indicated that he would return to work after his next surgery or participate in retraining. No retraining goals were identified.

I am prepared to review earning and salary levels to the extent that they become available at a latter date.

**Medical History and Status**. Mr. Guarino has a significant medical history resulting from a work-related incident occurring in 1995 when he broke his right hand.

On February 5, 2005, Mr. Guarino apparently was unloading glass crates from a flat bed truck when he claims that he tripped on some wire mesh that was embedded in the soil, causing him to twist his ankle and fall. He was brought to the Tobey Hospital and diagnosed with a fracture of the left posterior malleolus and a spiral fracture of the left fibula. He was provided with a soft cast and told to follow with an orthopedic physician.

Mr. Guarino was treated at the Emergency Room at the Sturdy Memorial Hospital under the care of Dr. C. Fathallah. X-rays confirmed the displaced posterior malleolus fracture and Dr. Fathallah performed surgery to place screws to stabilize the fracture on February 18, 2002.

Mr. Guarino was in a cast for 12 weeks and the hardware was removed in April 2002, followed by physical therapy.

A subsequent X-ray indicated that there were bone spurs present and apparently causing pain in his ankle. A tentative plan was to remove the bone spurs surgically. Apparently Mr. Guarino did not have treatment for an extended period and did not return to work. A consultation with Dr. S. Blazar in November 2002 resulted in a recommendation for injections and a finding that Mr. Guarino was capable of sedentary work activities with restrictions. Mr. Guarino was referred to physical therapy by Dr. Fathallah in January 2003.

In April 2003, Mr. Guarino reported left ankle pain and was evaluated by Dr. Digiovanni for an IME. He recommended an arthroscopy of the left ankle and also a work hardening program. Mr. Guarino had an arthroscopy performed by Dr. Fathallah in June 2003 followed by a period of physical therapy and monthly visits with Dr. Fathallah.

Mr. Guarino reports that there was another arthroscopy in 2004 although there is no record of it. In March 2005, Dr. Fathallah performed a left ankle fusion for degenerative arthropathy using hardware. Diagnostic examinations indicate that the ankle was not healing after approximately nine months.

In an April 25, 2006 review of medical records and status, Dr. H. Glick, orthopedic surgeon, noted the posterior malleous fracture, bone spurs, arthritis, and degenerative conditions. He opined that Mr. Guarino was not at a medical end result as there may be a non-union of the ankle fusion with resulting pain and need for further surgery to treat the non-union. He concluded that a successful ankle fusion would result in "...very significant pain relief and would not preclude an individual from fulltime work in many occupations..."

## Vocational summary and opinion

Based on successful fusion of his left ankle, Mr. Guarino would be expected to have reduced pain and reduced range of motion of his left ankle. Based on successful surgery and involvement in a work hardening program, as recommended by treating and evaluating physicians, it is reasonable to expect that Mr. Guarino may be able to return to work as a glazier.

If Mr. Glazier is not able or not interested in returning to glazier work, there are additional occupations consistent with his background and residual abilities that would be realistic to explore. As he has a background in construction or production trades, representative jobs are described. Within sedentary or light physical demands, Mr. Guarino could explore jobs in select machinist trades or construction positions such as crane operator or select construction equipment operator positions. If vocational evaluation indicates potential, Mr. Guarino may explore opportunities for different construction estimator positions. As work hardening and evaluation of vocational aptitudes and interests have not been conducted, and he has been out of work since 2002, I would recommend that he have vocational rehabilitation services, if interested.

Salary in the Rhode Island economy for positions identified above, without consideration to union pay levels, range from approximately $15.75 per hour to $26.50 per hour (Bureau of Labor Statistics, Occupational Employment Statistics Survey; Rhode Island Department of Labor and Training, Labor Market Information, 2004 data).

These opinions are preliminary and based upon limited records and information currently available. Should more information become available, I would like to reserve my right to review the material and amend my opinions, if needed. With opportunity to conduct a vocational evaluation of Mr. Guarino, additional vocational opportunities may be identified.

Norman C. Hursh, ScD, CRC, CVE
Vocational Rehabilitation

APPENDIX  IIA

## NORMAN CHRISTOPHER HURSH
9 Jeffrey Circle
Bedford, Massachusetts 01730
617/353-2709 (Work)
781/275-1545 (Home)
E-Mail: nhursh@bu.edu

## AREAS OF SPECIALIZATION:

- Employability Indicators for Persons with Significant Disability.
- Industrial Rehabilitation and Disability Management.
- Vocational Evaluation Process and Technology.

## EDUCATION

Sc.D.    Boston University
         Sargent College of Health and Rehabilitation Sciences
         Boston, Massachusetts
         Rehabilitation Counseling
         May 1978

M.Ed.    Boston University, Boston, Massachusetts
         Rehabilitation Counseling
         May 1970

B.A.     Boston University, Boston, Massachusetts
         Psychology
         May 1968

## EMPLOYMENT

1990 to present    Associate Professor
                   Boston University
                   Department of Rehabilitation Counseling
                   Sargent College of Health and Rehabilitation Sciences
                   Boston, MA  02215

1978 to 1989       Assistant Professor
                   Boston University
                   Department of Rehabilitation Counseling
                   Sargent College of Allied Health Professions
                   Boston, MA  02215

1990 to present    Director of Vocational Rehabilitation Services
                   Sargent College Clinical Centers
                   Boston University

1978 to present    Director of Vocational Evaluation Specialization
                   Department of Rehabilitation Counseling
                   Boston University

1986 to present    Director of Industrial Rehabilitation and Disability Management

|  |  |
|---|---|
|  | Department of Rehabilitation Counseling<br>Boston University |
| 1990 to present | Director of Vocational Rehabilitation Counseling Specialization in Special Education<br>Boston University |
| 1989 to 1991 | Director of Social Security Employment and Research Project<br>Boston University |
| 1986 to 1989 | Project Director of Transitional Skill Development for Special Needs Students<br>Department of Rehabilitation Counseling<br>Boston University |
| 1984-1986 | Director of Vocational Rehabilitation for Special Educators<br>Department of Rehabilitation Counseling<br>Boston University |
| 1980-1986 | Co-Director of Industrial Rehabilitation Training Specialization<br>Department of Rehabilitation Counseling<br>Boston University |
| 1980-1984 | Associate Director of Psychiatric Rehabilitation<br>Department of Rehabilitation Counseling<br>Boston University |
| 1978-1984 | Director of Graduate Field Services<br>Department of Rehabilitation Counseling<br>Boston University |
| 1976-1978 | Teaching Fellow and Lecturer<br>Department of Rehabilitation Counseling<br>Boston University |
| 1974-1978 | Clinical Associate<br>Department of Rehabilitation Counseling<br>Boston University |
| 1972-1978 | Director of Education and Training<br>John T. Berry Rehabilitation Center<br>Department of Mental Health and Mental Retardation<br>N. Reading, MA. |
| 1970-1972 | Rehabilitation Counselor<br>John T. Berry Rehabilitation Center<br>N. Reading, MA. |

*Norman C. Hursh, Page 3*

# GRANT DEVELOPMENT:

"Job Retention Factors for Homeless People with Significant Disabilities," Funded by Dept. of Education, National Institute on Disability and Rehabilitation Research. 2002-2005. Total Funding: $450,000

"Targeted Vocational Evaluation: Employment Skills, Job Retention, and Assistive Technology." Funded by Projects With Industry – OSERS as a subcontract with Boston Public Schools School To Career. 2000-2005.

"Skill-based Training in Vocational Evaluation to Empower Persons with Severe Disability," Funded by OSERS, Rehabilitation Services Administration. 2000-2005. Total funding: $496,5000

"Database Development in Disability Management: REHADAT Canada," Funded by National Institute of Disability Management and Research (NIDMAR). 1997. Total funding: $22,751

"Skill-based Training in Vocational Evaluation to Empower Persons with Severe Disability," Funded by OSERS, Rehabilitation Services Administration. 1997-2000. Total funding: $280,014

"Industry-based Training to Enhance Job Development and Placement Services for Persons with Severe Disabilities", Norman C. Hursh, Project Director. Funded by Rehabilitation Services Administration 1994-1997. Total Amount: $272,046

"Skill-based Vocational Evaluation Education to Empower Persons with Severe Disability", Norman C. Hursh, Project Director. Funded by Rehabilitation Services Administration 1994-1997. Total Amount: $245,367.

"Job Analysis in Cumulative Trauma Disorders", Norman C. Hursh, Co-Project Director. Boston University seed grant, 1994-1995. Total Amount: $12,000.

"Long-term Training in Industrial Rehabilitation and Disability Management", Norman C. Hursh, Project Director. Funded by Rehabilitation Services Administration 1991-1994. Total Amount: $235,000.

"Long-term Training in Vocational Evaluation", Norman C. Hursh, Project Director. Funded by Rehabilitation Services Administration, 1991-1994. Total Amount: $243,600.

"Personnel Preparation Training for Rehabilitation Counselors in Special Education", Norman C. Hursh, Project Director. Funded by Office of Special Education and Rehabilitation Services, 1991-1994. Total Amount: $209,700.

"Social Security Administration", Norman C. Hursh, Project Director. Funded by Social Security Administration 1989-1991. Total Amount: $1,100,000.

"Industrial Rehabilitation and Disability Management", Norman C. Hursh, Project Director. Funded by Rehabilitation Services Administration, 1986-1989. Total Amount: $330,950.

"Model Demonstration Project in Transition and Supported Work for Severely Disabled Deaf-Blind Students", Norman C. Hursh, Project Director. Funded by Special Project Division, Department of Special Education and Rehabilitation Services, 1986-1989. Total Amount: $258,172.

"Long-term Training for Special Educators to Develop Vocational Rehabilitation Skills", Norman C. Hursh, Project Director. Funded by Department of Personnel Preparation, Department of Special Education and Rehabilitation Services, 1984-1987. Total Amount: $267,013.

"Situational Assessment Models with Psychiatrically Disabled Individuals", Norman C. Hursh, Project Director. Funded by National Institute of Handicapped Research (NIHR) through the Boston University Center for Psychiatric Rehabilitation, 1984-1984. Total Amount: $22,500.

"Vocational Evaluation Strategies for Psychiatrically Disabled Individuals", Norman C. Hursh, Project Director. Funded by National Institute of Handicapped Research (NIHR) through the Boston University Center for Psychiatric Rehabilitation, 1984-1984. Total Amount: $21,000.

### *Grant Awards - Secondary Responsibility*

"Undergraduate Education in Vocational Evaluation", Arthur E. Dell Orto, Project Director. Funded by Rehabilitation Services Administration, 1986-1990. Total Amount: $249,500.

"Long-Term Training in Psychiatric Rehabilitation", Arthur E. Dell Orto and Marianne Farkas, Project Directors. Funded by Rehabilitation Services Administration, 1985-1989. Total Amount: $324,000.

"Long-Term Training in Rehabilitation Counseling", Arthur E. Dell Orto, Project Director. Funded by Rehabilitation Services Administration, 1978-1981. Total Amount: $133,770.

## PROFESSIONAL LICENSE AND CERTIFICATIONS:

Certified Rehabilitation Counselor (No. 2612), Commission on Rehabilitation Counselor Certification (National).

Certified Vocational Evaluator (No. 1652) Commission on Certification on Vocational Evaluation and Work Adjustment Specialists (National).

Licensed Psychologist (No. 2456), Commonwealth of Massachusetts. Granted June, 1980.

Licensed Rehabilitation Counselor, Commonwealth of Massachusetts. Granted, 1994.

## PROFESSIONAL COMMITTEES AND AFFILIATIONS:

### *Editorial Boards:*

| | |
|---|---|
| 1990-2002 | Editorial Board: *Work: A Journal of Prevention Assessment, and Rehabilitation* |
| 1988-1991 | Editorial Board: *Disability Manager* |
| 1986-1998 | *Psychosocial Rehabilitation Journal* - Reviewer |
| 1982-1998 | Editorial Review Board - *Rehab Brief* |

*Norman C. Hursh, Page 5*

### Committees and Professional Offices:

Certification of Disability Management Specialists Commission – Commissioner (2000-2005)
Chair of CDMS – 2005-2006

American Rehabilitation Counseling Association - Task Force on Assessment in Rehabilitation (1990-1992)

American Rehabilitation Counseling Committee on Supported Employment Initiative, Legislation, and the Rehabilitation Profession (1987-1990).

President's Council on Employment of the Handicapped - Special Committee on Supported Work (1987-1990).

National Council on Rehabilitation Educators - Region 1 Representative (1983 - 1985). (Elected Office)

National Council on Rehabilitation Education-Legislative Committee (1984-85).

National Training Committee - Member - Vocational Evaluation and Work Adjustment Association, 1980-1986.

Massachusetts Rehabilitation Counseling Association Executive Board Member (1981-1983).

Massachusetts Rehabilitation Counseling Association Board Member (1978-1981).

ARCA Research Award Committee, (1980-1981); (1982-1983)

### Professional Organizations:
Vocational Evaluation and Work Adjustment Association
National Council on Rehabilitation Education
National Rehabilitation Counseling Association

## PROFESSIONAL AWARDS AND RECOGNITION
Switzer Scholar – 24th Switzer Seminar, Washington DC. October 18-19, 2003.

Educational Partnership Award. Boston Public Schools – STRIVE Program. May, 2001.

Excellence in Community Service Award. Horace Mann School for Deaf and Hearing Impaired - Education and Industry Partnerships. 1988

Distinguished Faculty Award. Evelyn Kirrane Award - Sargent College of Allied Health Professions. 1987

## RESEARCH AND PUBLICATIONS:

### Books:
Hursh, N.C. and Kerns, A.F. (1988). Vocational Evaluation in Special Education. California: College Hill Press.

Shrey, D.E., Mitchell, D.K. and Hursh, N.C. (1985). <u>Employer Development and Industrial Exploration Manual</u>. Ohio: International Center for Industry, Labor and Rehabilitation.

## Book Chapters:

Rosenthal, D., Hursh, N.C., Lui, J., Zimmermann, W., & Pruett, S. (2004). Workplace disability management: Case management implications. F. Chan (Ed). Case Management in Rehabilitation. Springer Publications.

Hursh, NC (1997). Making a difference in the workplace. In Zimmerman, W. Ed. *Strategies for success*. Port Alberni, British Columbia, Canada: National Institute of Disability Management and Research.

Hursh, N.C. (1995). Rehabilitation assessment. In A.E. Dell Orto and R.P. Marinelli (Eds.) <u>Encyclopedia of Disability and Rehabilitation</u>. New York: Macmillan.

Hursh, N.C. (1995). Essential skills in industrial rehabilitation and disability management: Implications for rehabilitation counselor education. In <u>Principles and Practices of Disability Management</u> D.E. Shrey and M. Lacerte (Eds). Orlando, FL: PMD Press.

Hursh, N.C. and Shrey, D.E. (1994). Protecting the employability of the working elderly. In G. Felsenthal, S. Garrison, and F. Steinbert (Eds.) <u>Rehabilitation of the aging and elderly patient.</u> Baltimore: Williams & Wilkins.

Hursh, N.C. (1990) Evaluating the work potential of learning disabled adults. In S. Scheer (Ed.). <u>Assessing the Vocational Capacity of the Impaired Worker</u>. Rockville, MD.: Aspen Publications, Inc.

Hursh, N.C. (1988) Section Editor. Vocational rehabilitation practice: State of the art. In M.G. Eisenburg and R.C. Grezesiak (Eds.). <u>Advances in Clinical Rehabilitation</u>. New York: Springer Publishing Company.

Hursh, N.C. and Price, F. (1983). Job tryouts in the work environment. In Lassiter, R.H. (Ed.). <u>Vocational Evaluation, Work Adjustment, and Independent Living</u>. Illinois: C.C. Thomas.

Hursh, N.C. and Anthony, W.A. (1983). The vocational preparation of the chronic psychiatric patient in the community. In I. Barofsky and R.D. Budson (Eds.). <u>The Chronic Psychiatric Patient in the Community: Principles of Treatment</u>. New York: Spectrum Publications.

Hursh, N.C. and Thurer, S. (1981). Characteristics of the helping relationship. In E. Walker (Ed.). <u>Clinical Practice of Psychology: A Practical Guide for Mental Health Professionals</u>. New York: Pergamon Press.

## ARTICLES AND PROFESSIONAL PAPERS:

Hursh, N.C., (2006). "Employers Becoming 'Educated Consumers" on Expertise, Credentials of Third-Party Providers." <u>The Self-Insurer</u>, 23, 4-7.

Stevens, M., & Hursh, NC. (2005). "Presenteeism: Taking an Integrated Approach." <u>Journal of Employee Assistance</u>, 3, 7-9.

McCarriston, W., Turner, T., **Hursh, NC**. (2004). "Housing, Employment, Health Care, and Legal Policies and Regulations: Impact on Homeless Individuals' Ability to Sustain Employment" Research Brief. Boston University/Community Work Services, Inc.

Forcier, M., Dean, C., **Hursh NC**. (2004). "Transitioning from Chronic Homelessness to Employment: Impact of a Positive CORI Report." Research Brief. Boston University/Community Work Services, Inc.

Hursh, N.C., & McCarriston, W. (2003). "Get a Job and Keep a Job: What makes a Difference for Homeless People? Research Brief. Boston University/Community Work Services, Inc.

Hursh, NC, McCarriston, W. (2003). "Targeting Employment and Job Retention for Individuals who are Homeless" Research Brief. Boston University/Community Work Services, Inc.

Hursh, N.C. (2003). "Pro-Work" strategies for older workers with disabilities: A disability management approach. Switzer Seminar Series. Washington, DC: National Rehabilitation Association.

Hursh, N.C., and Lui, J. (2003). Disability and productivity: A message for the global workplace. Journal of Rehabilitation Administration, 27, 1, 47-54.

Hursh, N.C. (2003). Benchmarking: What works in disability management. Business and Health, January, 2003.

Hursh, N.C. and Shrey, D.E. (1999). Disability management - An international perspective. Case Review, 1, 1, 35-41.

Shrey, D. and Hursh, N. (1999). Workplace Disability Management: International Trends and Perspectives. Journal of Occupational Rehabilitation, 9 (1), 45-59.

Hursh, N.C. (1994) Vocational Assessment of Persons with Disability: A Training Manual. Monograph II. Wellington, New Zealand.

Hursh, N.C. (1994) Career Planning and Job Placement. Monograph IV. Wellington, New Zealand.

Hursh, N.C. (1993). Advances in Vocational Evaluation of Injured Workers. Conference Proceedings: Advancing Rehabilitation. Intervention. Latrobe University: Melbourne, Australia.

Hursh, N.C. (1993). Vocational Evaluation with Older Workers. Sixth National Forum on Vocational Evaluation. Materials Development Center: Menomonie, WI.

Shrey, D.E., Bangs, S.A., Mark, L.S., Hursh, N.C., and Kues, J.R. (1991). Returning social security beneficiaries to work: A proactive disability management model. Rehabilitation Counseling Bulletin, 34, 3, 257-273.

Shrey, D.E. and Hursh, N.C. (1990). Reducing Work Reduction of Job-Related Impairment: Proactive Disability Management Interventions. Proceedings of 7th Annual NRCA Annual Symposium. Boston, MA.

*Norman C. Hursh, Page 8*

Hursh, N.C., Stein, K., and Barthe, J. (1990). <u>Case management and Work Incentive Utilization: A training model</u>. Research monograph #2. Set Industries: Hardwich, VT.

Hursh, N.C., Rogers, E.S., & Anthony, W.A. (1989) Diagnostic vocational evaluation with psychiatrically disabled individuals: Results of a national survey. <u>Vocational Evaluation and Work Adjustment Bulletin.</u>

Hursh, N.C., Shrey, D.E. (1989). Vocational evaluation and physical capacities evaluation: Bridging the gap between medical and vocational arenas. <u>Business and Health.</u>

Hursh, N.C. (1989) Implementing vocational evaluation with learning disabled adolescents: Guidelines for teachers. <u>Academic Therapy</u>, 25, <u>2</u>, 201-215.

Hursh, N.C. & Dellario, D.D. (1989) Situational assessment with psychiatrically disabled individuals: Determining employability. <u>Community Mental Health.</u>

Hursh, N.C. (1988) Vocational evaluation with injured workers: First steps in vocational rehabilitation planning. <u>Disability Manager</u>.

Hursh, N.C. (1987). <u>Vocational evaluation as a foundation for vocational transition planning</u>. Monograph. Ohio: Ohio Resource Center for Low Incidence and Severely Handicapped.

Hursh, N.C. (1987). <u>Prevocational and work adjustment training for severely handicapped students</u>. Training monograph. Ohio: Ohio Resource Center for Incidence and Severely Handicapped.

Hursh, N.C (1984) Vocational evaluation of learning disabled adults. <u>Journal of Rehabilitation</u>, 50(2), 45-52.

Hursh, N.C. and Dellario, D. (1984). <u>Situational assessment: Identifying vocational potential of psychiatrically disabled individuals</u>. Research monograph. Boston: Research and Training Center in Mental Health.

Shrey, D.E. and Hursh, N.C. (1984). <u>Industrial rehabilitation and the private sector: Revitalizing rehabilitation psychology education</u>. Monograph. Boston: Boston University.

Hursh, N.C. (1983). <u>Diagnostic vocational evaluation with psychiatrically disabled individuals: A national survey</u>. Research monograph. Boston: Research and Training Center in Mental Health.

Shrey, D.E. and Hursh, N.C. (1983). <u>Rehabilitation of the industrially disabled: Research results and counseling strategies</u>. Research monograph. Boston: Boston University.

Hursh, N.C., Shrey , D.E., Lasky, R.G., and D'Amico, M.L. (1982). A career education model for students with special needs. <u>Teaching Exceptional Children</u>, September, 52-56.

Hursh, N.C. and Minch, J. (1981). Consumer involvement: The Massachusetts consumer involvement program. <u>Rehabilitation Literature</u>, January-February, 17-20.

Hursh, N.C. (1981). Employee assistance programs: A skills based approach. Monograph #5: Industrial Rehabilitation Training Project. Boston: Boston University.

Hursh, N.C. and Minch, J. (1979). Involving disabled consumers in vocational rehabilitation. Monograph #3. Boston: Tufts-New England Medical Center Research and Training Center.

## PROFESSIONAL PRESENTATIONS, WORKSHOPS AND SEMINARS:

### *International*

Shrey, D., & Hursh, N.C. International Survey of Disability Management Practice. Second International Forum on Disability Management. Masstricht, NL. September 14, 2004.

Hursh, N.C. Disability Management Education: Past, Present, & Future. International Forum on Disability Management, Vancouver, B.C. Canada. May 27, 2002.

Hursh, N.C. Job Accommodation: Policy and Process in Disability Management. National Institute of Disability Management and Research, Vancouver Island, B.C. Canada. June 7, 1995.

Hursh, N.C. Assessment Interventions in Disability Management. ACC, Wellington, New Zealand. November 4, 1995.

Hursh, N.C. Case Management Approaches to Enhance Productivity of Individuals with Disabilities. ACC, Wellington, New Zealand. March 19-26, 1994.

Hursh, N.C. Advances in Vocational Evaluation Practice with Injured Workers. Keynote address at Advancing Rehabilitation International Conference. Melbourne, Australia. November 3, 1993.

Hursh, N.C. Reasonable Accommodation and the Return to Work Process for Injured Workers. Toronto, O.N., Canada. October, 1992.

### *National:*

Hursh, N.C. Changing Roles Functions of Disability Managers: Results of a CDMSC National Survey. IARPS National Annual Conference. Scottsdale, AZ. May, 2004.

Hursh, N.C. (2003). "Pro-Work" strategies for older workers with disabilities: A disability management approach. 24th Switzer Seminar Series. Washington, DC. October 17, 2003.

Hursh, N.C., & Calkins, J. International Perspectives in Disability Management: A Code of Practice. National Rehabilitation Association National Conference, Indianapolis, IN. October, 2002.

Hursh, N.C. Disability Management for the Older Workers: Alternatives to retirement. National Congress of Physical Medicine and Rehabilitation, Washington, DC. April, 1994.

Hursh, N.C. Accommodations at the Worksite: From Theory to Practice. North American Conference of Rehabilitation International. Atlanta, GA. October 29, 1993.

*Norman C. Hursh, Page 10*

Hursh, N.C.  Disability Management Interventions for the Industrially Injured Worker.  Vancouver, BC, Canada.  March, 1993.

Hursh, N.C., Power, P.W., & Hershenson, D.  Emerging Trends in Vocational Evaluation.  National Forum on Vocational Evaluation.  Virginia Beach, VA.  March 5, 1993.

Hursh, N.C.  Vocational Evaluation with the Older Worker.  National Forum on Vocational Evaluation. Virginia Beach, VA.  March 4, 1993.

Hursh, N.C.  ADA Compliance Strategies in Industrial Rehabilitation and Disability Management. Dallas, TX.  February 19, 1993.

Hursh, N.C.  The Role of the Physician Under ADA.  St. David's Rehabilitation Hospital.  Austin, TX. February 18, 1993.

Hursh, N.C.  Disability Management and the ADA:  Proactive Interventions and Future Trends. American Congress of Rehabilitation Medicine.  San Francisco, CA.  November, 1992.

Hursh, N.C., Shrey, D.E., & Lacerte, M.  Disability Management Interventions for the Industrially Injured Worker.  Toronto, Canada, October, 1992.

Hursh, N.C. Reasonable Accommodation and the Return to Work Process for Injured Workers. Toronto, Canada.  October, 1992.

Hursh, N.C. & Shrey, D.E.  Industrial Rehabilitation and ADA:  Divergence and Convergence.  Mercy Hospital, Pittsburg, PA.  June 5, 1992.

Hursh, N.C. and Stein, K.  Social Security Work Incentives and the State-Federal VR System, White River Junction, VT.  April 10, 1992.

Hursh, N.C.  Vocational Evaluation of Special Populations:  Learning Disabled Adults.  National Conference, AACD, Washington, DC.  March 29, 1992.

Hursh, N.C.  Vocational Evaluation of the Aging Worker.  Boston, MA.  March 14, 1992.

Hursh, N.C.  Disability Management in Industry:  A Workshop for Rehabilitation Personnel.  Boston, MA.  January 31, 1992.

Hursh, N.C.  Social Security Administration Work Incentives:  Implementing Work Return Plans. CARF Conference, Harrisburg, PA.  January 27-28, 1992.

Hursh, N.C., Tyrrell, W., and Stein, K. Work incentives and disincentives for SSDI beneficiaries: Enhancing work return outcomes.  National Convention of NARPPS.  Washington, DC.  March 1991.

Hursh, N.C. and Tyrrell, W. PASS work incentives:  An effective case management tool for private rehabilitation providers.  National Convention of NARPPS. Washington, DC.  March 1991.

Hursh, N.C. and Stein, K. Utilization of cash incentives for SSDI beneficiaries. Social Security Administration Project Director's Conference. Baltimore, MD. March 1990.

Hursh, N.C. and Stein, K. Work incentives and case management strategies with SSDI beneficiaries. NARPPS National Conference. New Orleans, LA. March 1990.

Hursh, N.C. Case management interventions with SSDI beneficiaries: A private rehabilitation initiative. NARPPS. New Orleans, LA. June, 1990.

Shrey, D.E. and Hursh, N.C. Reducing work disruption resulting from injury and disability: Proactive interventions in disability management. National Rehabilitation Counseling Association, Annual Professional Symposium. Boston, MA. February, 1990.

Hursh, N.C. Situational assessment strategies to promote transition from school to work. Washington, D.C. University of Illinois Transition Planning Conference. January, 1988.

Hursh, N.C. Crossover curriculum to promote generalization of functional skills. Washington, D.C. O.S.E.R.S. Conference on Transition. April, 1988.

Hursh, N.C. Vocational evaluation in transition planning for special needs learners. Ohio Department of Special Education. January, 1987.

Hursh, N.C. Prevocational and work adjustment behaviors in the workplace: Behavior change strategies for the special educator. Ohio Department of Special Education. February, 1987.

Hursh, N.C. Vocational evaluation strategies with the learning disabled adult. National Training Project on Learning Disabilities. University of Pittsburgh. October, 1986.

Hursh, N.C. Situational Assessment: Determining employability of psychiatrically disabled persons. National Convention of the National Alliance of the Mentally Ill. Boston, MA. July, 1986.

Hursh, N.C. Vocational rehabilitation and low back pain: Alternatives for injured worker. Liberty Mutual Insurance Company. Boston, MA. March, 1986.

Hursh, N.C. Industrial analysis technology in special education. Special Education Administrators, Columbus, Ohio. September, 1985.

Hursh, N.C. Vocational rehabilitation of the learning disabled adult: Vocational evaluation issues. National Convention of American Association on Counseling and Development. New York, N.Y. April, 1985.

Hursh, N.C. and Shrey, D.E. The role of industrial analysis in special education.. National Convention of the Council for Exceptional Children. Boston, MA. March, 1985.

Hursh, N.C. Transitioning programs in special education. Conference sponsored by Special Educational Department, University of Maine. October, 1984.

Hursh, N.C. and Dellario, D.  Situational assessment effectiveness and vocational outcome.  National Convention of American Psychological Association.  Toronto, Canada.  August, 1984.

Hursh, N.C.  Industrial rehabilitation:  Critical concerns in rehabilitation psychology education.  National Convention of American Psychological Association, Toronto, Canada.  August, 1984.

Shrey, D.E. and Hursh, N.C.  Counseling injured workers:  Rehabilitation Education Goals.  National Convention of American Association on Counseling and Development.  Houston, TX.  March, 1984.

Hursh, N.C.  Vocational evaluation of severely psychiatrically disabled individuals:  Results of a national survey.  National Convention of American Psychological Association.  Anaheim, CA.  August, 1983.

Hursh, N.C.  Vocational evaluation strategy with learning disabled adults.  National Training Project on Learning Disabilities.  University of Pittsburgh.  June, 1983.

Hursh, N.C., Levinson, B. and Hershenson, D.  Vocational assessment and career counseling with learning disabled adolescents:  Education and rehabilitation challenges.  National Convention of American Personnel and Guidance Association.  Washington, D.C.  March, 1983.

Hursh, N.C.  Rehabilitating the person with a psychiatric disability:  State of the art.  Keynote address.  Georgia Community Support Program.  Atlanta, Georgia.  October, 1981.

Hursh, N.C.  Developing a rehabilitation plan:  Employment goals.  Georgia Community Support Program.  Atlanta, Georgia.  October, 1981.

Hursh, N.C. and Shrey, D.E.  Career development models:  Theory and practice with special needs students.  National Convention of American Personnel and Guidance Association.  Atlanta, Georgia.  April, 1980.

### Regional:

Hursh, N.C.  Employment Realities in School-to-Work Transition Efforts.  MAVSNP, Boston, MA.  May 15, 1994.

Hursh, N.C.  School-to-Work Transition for Students at Risk.  Blackstone Valley Vocational Technical Conference.  October, 1993.

Hursh, N.C.  Industrial Rehabilitation and Disability Management:  Opportunities for Occupational Medicine.  Wellesley, MA.  January 19 and 20, 1993.

Hursh, N.C. & Bianchi, L.  ADA and the Banking Industry.  New England Banking Institute, Boston, MA, September, 1992.

Hursh, N.C.  ADA:  Developing Compliance Plans in Industry.  New England Industrial Advisory Board, Boston, MA.  May 29, 1992.

Hursh, N.C.  ADA:  Implications for Employers.  New England Industrial Advisory Board, Malden, MA.  April 14, 1992.

Hursh, N.C. Developing supported employment sites in a difficult economy. Annual Conference of MAVSNP. Boston, MA. March 1990.

Hursh, N.C. The role and function of vocational evaluation in transition planning. Horace Mann School for the Deaf and Hearing Impaired. October, 1986.

Hursh, N.C. Considerations in evaluating the potential of learning disabled students. Marshfield Special Education Consortium. April, 1986.

Hursh, N.C. Prevocational and vocational evaluation training issues. American Occupational Therapy Association. Boston, MA. June, 1985.

Hursh, N.C. and Sullivan, M. Vocational Evaluation of learning disabled students. Special Education, Boston, MA. May, 1985.

Hursh, N.C. and Shrey, D.E. Promoting vocational transition through industrial alliances. Special Education Continuing Education Consortium Boston, MA. April, 1985.

Hursh, N.C. Implementing affective vocational programming for the learning disabled student: Evaluation and productive program techniques. Portland, ME. November, 1985.

Hursh, N.C. Vocational Education/career education - Implementation of program models. Boston Public Schools. Boston, MA November, 1984.

Hursh, N.C. and Shrey, D.E. Implementing a vocational focus in special education. Massachusetts Association of 766 Approved Private Schools (MAAPS). Allston, MA. February - April, 1984.

Hursh, N.C. Methodology in evaluating vocational potential of special needs learner. MAAPS. Allston, MA February, 1983.

Hursh, N.C. Testing and test modification in vocational evaluation. Greater Lawrence Special Education Conference. Lawrence, MA. April, 1983.

Hursh, N.C. Vocational evaluation issues with psychiatrically disabled individuals. New England Psychiatric Training Institute. Cambridge, MA. May, 1983.

Hursh, N.C. and Wiig, E. Rehabilitation of clients with learning disabilities: Evaluation practice. Massachusetts Rehabilitation Commission. Boston, MA. June, 1983.

Hursh, N.C. and Lasky, R.G. Job seeking skills for industrially disabled workers. Sentry Insurance Company. Burlington, MA. November, 1983.

Kulich, R., Hursh, N., and Konn, S. Management of chronic pain - Combining Strategies. Massachusetts Psychological Association, Annual Convention. Boston, MA. May, 1983.

Hursh, N.C. Vocational programming with psychiatrically disabled persons: Impact and outcome. Community Support Program Annual Conference - Region I. Brettonwood, N.H. October, 1983.

*Norman C. Hursh, Page 14*

Hursh, N.C. New approaches in evaluating the vocational potential of psychiatrically disabled persons. New England Psychiatric Training Institute. Cambridge, MA. March, 1982.

Hursh, N.C. The rehabilitation process: Returning employees to work. Boston Committee on Employment of the Handicapped. Cambridge, MA. November, 1981.

Hursh, N.C. Wechsler Adult Intelligence Scale and Significant Worker Trait Characteristics. Massachusetts Rehabilitation Commission. Sturbridge, MA. April, 1981.

Hursh, N.C. and Shrey, D.E. Career Survival Skills for Rehabilitation Professionals. Massachusetts Rehabilitation Counseling Association Annual Meeting. Boston, MA. February, 1980.

Hursh, N.E. and Shrey, D.E. Career Survival Skills for Nursing Professionals. Massachusetts Nursing Association. Brookline, MA. December, 1979.

Hursh, N.C. Assessment models for chronic psychiatrically disabled individuals in the community. Department of Mental Health, Lynn, MA. September, 1979.

Hursh, N.C. Supervisory skills enhancing rehabilitation professionals performance. Presented for the Department of Mental Health. Waltham, MA. March, 1979.

Hursh, N.C. Motivational problems in state DVR: Problems and solution. Workshop Series for the Massachusetts Rehabilitation Commission. Brookline, MA. April - May, 1979.

Hursh, N.C. Application of current issues and theory to program development for the mentally retarded: A model for programming. Presented at the American Association on Mental Deficiency, Annual Conference. Burlington, Vermont. October, 1978.

Hursh, N.C., Levy, W., and LaPenta, R. Job Seeking Skills Training with Mentally Retarded Individuals. American Association on Mental Deficiency. Burlington, VT. October, 1978.

Hursh, N.C. Feasibility of Career Education in Economically Troubled Times. Department of Education, Careers Workshops, Lynnfield, MA. January, 1978.

## PROFESSIONAL CONSULTATION AND PUBLIC SERVICE:

1996-2000    International Research Chair - National Institute on Disability Management and Research, Vancouver, BC, Canada

1996-2002    Editorial Board - *Work: A Journal of Prevention, Assessment, & Rehabilitation*

1994-1996    Vocational Rehabilitation Consultant to Accident Rehabilitation and Compensation Insurance Corporation (ACC), New Zealand

1995-2000    Disability Management Consultant to National Institute on Disability Management and Research, Vancouver, B.C., Canada

*Norman C. Hursh, Page 15*

| | |
|---|---|
| 1982-1991 | Vocational Rehabilitation Consultant to Lahey Clinic Medical Center, New England Rehabilitation Hospital, Liberty Mutual Insurance Company and Sentry Insurance Company. |
| 1985-1988 | Member of National Advisory Board for Training Program in <u>Specific Learning Disabilities for Rehabilitation Psychologists</u>. Administered by the University of Pittsburgh. Program funded by Rehabilitation Services Administration. |
| 1987-90 | Member of Advisory Board for federal project entitled <u>Disability Management of Social Security Beneficiaries: A Physical Medicine and Vocational Rehabilitation Demonstration Project</u>. Administered by the University of Cincinnati Medical Center, Cincinnati, OH. Program funded by Social Security Administration. |
| 1981-1988 | Vocational Rehabilitation Consultant to private industry, including 3-M, Honeywell-Bull Information Systems, and Stop and Shop. |
| 1986 | Member of National Advisory Board for <u>Interdisciplinary Social Security Disability Income Job Preparation Project</u>. Administered by the International Center for Industry, Labor and Rehabilitation, Columbus, Ohio. Program funded by Social Security Administration, Washington, DC. |
| 1983-1988 | Federal Grant Reviewer for Rehabilitation Services Administration Long Term Training Projects, Washington, DC. |
| 1984-1986 | Federal Grant Consultant for Office of Special Education and Rehabilitation Services, Special Education Grants, O.S.E.R.S. |
| 1986 | Rehabilitation Consultant to Massachusetts Department of Mental Health to conduct evaluation of vocational programs for State Hospital - Medfield State Hospital. |
| 1978-1982 | Tufts New England Medical Center Research and Training Center Program Evaluation Consultant, Boston, MA. |
| 1980-1981 | Rehabilitation Consultant, Department of Manpower Training, Governors Commission on Manpower Development, Boston, MA. |
| 1980-1981 | Training Consultant to Massachusetts Department of Mental Health in diagnostic planning in community mental health systems. |
| 1980-1988 | Reviewer for <u>Rehabilitation Brief</u> |

**Deposition and Trial Testimony Activity 2000-2006**
For
Dr. Norman C. Hursh

Mark A. Doherty vs. Goss Graphic Systems, Inc. et al.
Trial testimony - Suffolk Superior Ct.
10/25/05
Testimony for the plaintiff

Kevin Quinan
Testimony at arbitration, Boston.
9/9/05
Testimony for the plaintiff

Catherine Walsh v. Stonehedge, et al.
Trial testimony – Suffolk Superior Court
5/9/05
Testimony for the plaintiff

Rose Marie Tune, Joseph Gately, et al v. Louis Saab, et al
Testimony at deposition
2/1/05
Testimony for the defense

J. Figueroa v. Worker Comp
Testimony before ALJ in WC hearing
11/24/04
Testimony for the plaintiff

M. Theodoridis v. AAirlines
Testimony before Special Master in NY, NY.
2/11/04
Testimony for the plaintiff

K. Gagnon, et al. v. Steego Corporation, et al.
Deposition testimony in South Easton, MA
12/04/03
Testimony for the defense

R. MaKean v. Abro Coroporation & Independent Bank Corporation
Trial testimony at Norfolk Superior Court – Dedham
9/25/03
Testimony for the plaintiff

Giuseppe Caico v.
Trial testimony in Norfolk Superior Court – Dedham
8/11/03
Testimony for the Plaintiff

B. J. Dean v. D.E. Mills, Stacey L. Belliveau & Dufficy Enterprises

Trail testimony in Norfolk Superior Court – Dedham
4/10/03
Testify for Plaintiff

Amanda Goldstein v. Austen Riggs, et al
Trial testimony in Pittsfield, MA
12/10/02
Testifying for the Plaintiff

Marybeth McDonald v. Seacoast Pathology, et al
Deposition in Newton, MA
12//9/02
Testifying for the Plaintiff

Diane Fuller v. Wal-Mart Stores, Inc.
Deposition in Boston, MA
10/18/02
Testifying for Plaintiff

Joseph Motinho vs.
Trial testimony in Worcester Superior, MA
10/15/02
Testifying for Plaintiff

Dennis Conway vs Elkhoury, Metro Plus, Inc., Lioncoln Ave Auto
Deposition in Boston, MA
9/24/02
Testifying for Plaintiff

Samuel Whidden vs.
Deposition in Boston, MA
7/31/02
Testifying for the Plaintiff

Sandra Raymond v. S. Raymond
Concord District Court – Concord
3/11/02
Testifying for the defense

K. William Binley v. Trilling and Trilling
Norfolk Superior Court – Dedham
10/18/01
Testifying for the plaintiff

Gary J. Fox v. North American Industries, Inc. and Jose Mata
Suffolk Superior Court – Boston
4/10/01
Testifying for the defense

George Carta v. McDonald's Restaurant of Massachusetts, Inc.
Norfolk Superior Court - Dedham
11/29/00

Testifying for the defense

G. E. Marotta
Old Federal Courthouse - Boston -  Trial testimony
8/8/00
Testifying for the plaintiff

Wm Weckerly vs UPS, et al
Springfield Superior Court - Trial testimony
7/24/00
Testifying for the defense

J. Facer vs. Narragansett Electric Company
Deposition in Boston
2/18/00
Testifying for the defense

D. Smith
Boston DIA Court - Industrial Accident testimony
1/4/00
Testifying for the plaintiff

APPENDIX  III

April 25, 2006

McDonough, Hacking & Lavoie, LLC
Counsellors At Law
John Conforti
6 Beacon Street, Suite 815
Boston, MA 02108

**RE:   Claimant:     Lorenzo Guarino**

## ORTHOPEDIC MEDICAL RECORD REVIEW OF LORENZO GUARINO

**INTRODUCTION:** The following is a medical record review and narrative report on Lorenzo Guarino based upon his medical records, which have been made available to me. I also reviewed his January 2005 deposition.

**MEDICAL RECORD REVIEW:** The earliest available medical records are from the Emergency Department of the Tobey Hospital dated 2/5/02. The records indicate that he presented with an injury to his left leg and ankle. The history obtained, was that he caught his left foot in mesh, which caused him to fall and twist his ankle. A left ankle x-ray was reported to demonstrate a fracture of the posterior malleolus and some generalized soft tissue swelling. A left lower leg x-ray revealed a spiral fracture of the mid shaft of the fibula. The treatment seems to have been the application of a splint. He was provided with crutches and instructed not to bear weight on the left. He was instructed to follow-up with an Orthopedic doctor within one to three days.

The next available records are from the Emergency Department of Sturdy Memorial Hospital Attleboro, Massachusetts on 2/8/02. The records indicate that he had been seen at the Tobey Hospital and he had also waited several hours at an orthopedic office before leaving. They repeated x-rays of his left ankle and leg. Once again, the x-ray report was that he had a fracture of

the posterior malleolus, some well corticated osseous fragments near the anterior tibia likely representing old avulsion injuries. There was a talar beak noted. The Sturdy records indicated that they made arrangements for him to be seen by one of their staff Orthopedic Surgeons, Dr. Charles Fathallah, on the following day.

Mr. Guarino then had definitive treatment for his left ankle injury by Dr. Fathallah on 2/10/02 at the Sturdy Memorial Hospital. The doctor's operative note describes that he had a displaced fracture of the left ankle with widening of the mortise, a fracture of the posterior malleolus, a Maisonneuve-type fracture. According to the operative note, the treatment consisted of placing two cancellous screws across the syndesmosis to fix it anatomically. This seems to have been done on an ambulatory surgical basis.

His first postoperative visit was 2/18/02. The rather brief note by the doctor described that he was doing better and was feeling more comfortable then before. The exam mentions that there was no oozing. X-rays were said to show good alignment at the fracture site. The note does not mention anything about a cast, but it appears from the claimant's deposition that he was in a cast for 12 weeks. On 3/18/02, he returned to see the Orthopedist. The note simply states doing very well fracture healing. They were going to make arrangements for removal of the syndesmosis screw and then start him on range of motion exercises.

At some point in early April 2002, the orthopedist removed the screws from the ankle. No operative note of this procedure has been provided. He returned to Dr. Fathallah on 4/11/02. The note states that his wound had healed and he removed the sutures. He obtained an x-ray of the ankle, which revealed that the hardware was absent and the ankle position was satisfactory. He was going to begin physical therapy.

He appears to have commenced physical therapy on 4/22/02 at Notre Dame Center for Occupational Health. There are records from that PT facility of approximately 17 visits between 4/22/02 and 6/26/02. At the time of his last visit, the PT note dated 6/26/02 stated that he was going to be referred to the Donely Center for a work hardening program. The note also mentions

that his Orthopedist was going to schedule him for removal of bone spurs. He was at that point independent in home exercise program.

Concurrent with his physical therapy at the Notre Dame Center, he continued to be followed by Dr. Fathallah. A 5/2/02 note states that his ankle was coming along slowly and range of motion was good. X-rays were said to show healing of the fracture site. On 5/23/02, the note states that his range of motion had improved but not fully. On 6/13/02, the note states that he returned to the office limping in pain with swelling of the ankle and severe exquisite localized tenderness involving the anterior part of the ankle joint. He had more pain in dorsiflexion than plantar flexion, but did not have much pain in pronation or supination. The x-ray revealed a healing fracture and for the first time, there is mention of a large spur anteriorly at the tibia. (There was mention of a beaking of the talus on the initial Sturdy Memorial Hospital x-rays). According to the Orthopedist's notes, he discussed with the claimant the possibility of pain coming from the spur and he felt excision of the spur would be helpful. The Surgeon stated that the claimant wanted to have the spur removed and he indicated he was going to book him for surgery at Sturdy Memorial Hospital and would see him back after the surgery. He specifically added an addendum to his note in which he stated that the spur that had developed on his left ankle was causally related to the injury sustained at work in the sense that it is traumatic by nature.

There seems to be an approximately six-month lapse in the records from Dr. Fathallah between 6/13/02 and his next recorded visit for which medical records have been provided on 12/30/02. Prior to that time, Mr. Guarino was seen for a comprehensive consultation with another orthopedist, Dr. Steven L. Blazar of The Orthopedic Group, Inc. in Pawtucket, Rhode Island. The note describes the circumstances of the fracture and the treatment. It goes on to state that the claimant had been told that he had "bone spurs" with persistent pain in the ankle and difficulty with ambulation. Dr. Fathallah had recommended removal of the spurs, although the patient was uncertain whether or not this was going to be done through an arthroscopic procedure or an open operation. He had not engaged in any rehabilitation or therapy since July 2002. He had not returned to his job as a glazer and he felt that he could not return to any type of similar job but was willing to try sitting in a truck and giving orders as a foreman. He had not had any x-rays

since 7/1/02. His examination revealed that he walked with external rotation of his left leg using a cane in his right hand. His range of motion was zero degrees dorsiflexion, full plantar flexion, and 20 degrees inversion. He had diffuse joint line discomfort not only along the anterolateral and anteromedial joint line but also posteromedially. There was tenderness along the posterior tibial tendon but he had no weakness. There was no tenderness on the dorsum of the foot. X-rays of the left ankle demonstrated a spur along the dorsal talus neck. There were degenerative changes along the anterior distal tibia, along the tibio-talar joint as well as along the medial and lateral tibias. There were two screw hole ghosts seen in the supra-malleolar area. There was good maintenance of ankle mortise. He had a diagnosis of tibio-talar arthrosis and S/P syndesmotic ORIF left ankle. The doctor advised caution with respect to removal of the dorsal talar spur. He did not feel that this was problematic. Instead, he felt that the claimant maybe suffering from arthrosis (arthritis) of his tibio-talar joint. Dr. Blazar stated that he was unsure as to whether or not this pre-existed because he did not have any date of injury x-rays to evaluate. He recommended a steroid injection to the joint and if this did not improve the situation, he might be a candidate for arthroscopic debridement. He would not recommend either excision of the dorsal talar spur or open debridement of his ankle. He felt that he was capable of sedentary activities that would allow him alternately to sit and stand to comfort tolerance. He should not walk on uneven surfaces, climb ladders, stoop, bend, or squat.

After a lengthy absence from Dr. Fathallah, Mr. Guarino returned to him on 12/30/02. They again discussed possible surgery for the bone spur for ankle joint debridement and spur removal. His examination revealed pain and tenderness of the ankle joint with pain on the medial side of the ankle, tenderness and pain with inversion, eversion, dorsiflexion, and plantar flexion. Dr. Fathallah treated him with a cortisone injection. He returned to the doctor on 1/6/03. The injection helped to some extent, but he was still having pain. The doctor indicated that he was going to start another course of PT and give him a prescription for pain control.

On 1/6/03, he was seen at JBL Rehab Associates for PT with a diagnosis of tendonitis. He appears to have had approximately eight PT sessions at JBL up to 4/12/03. There had been no change in his condition at the time of his last visit. He continued follow-up with Dr. Fahallah. A

1/27/03 note states that his ankle was feeling slightly better. His exam revealed some clicking, crepitation and pain with range of motion. He was told to continue with PT.

On 2/10/03, there is an Addendum Note from Dr. Blazar who had done a comprehensive consultation on 11/19/02. The letter is in response to a question from a claim examiner from the insurance company. Dr. Blazar stated that from his perspective, it was clear from the x-ray report dated 2/8/02 that the degeneration noted along the tibio-talar joint area was pre-existing. The talar beak as well as avulsion injuries along the anterior tibia were noted on the date of the injury and therefore, tibio-talar arthrosis was pre-existing. He went on to state that the fractures of the lateral malleolus along the mid aspect of the fibular as well as the posterior malleolus would not cause the degeneration noted along the talar neck or the anterior tibio-talar joint. He reached these opinions to a reasonable degree of medical certainty.

Mr. Guarino returned to Dr. Fathallah on 3/10/03. He was limping severely and still had anteromedial pain. His range of motion was painful. New x-rays were said to show a large bone spur at the distal end of the tibia and they also showed evidence of arthritis. Dr. Fathallah felt that he should have an operation to excise the dorsal spur, which would help him possibly gain some more mobility and lessen his pain.

On 4/16/03, Mr. Guarino was seen for an Orthopedic IME by Dr. Christopher Digiovanni in Providence. By then, he still had fairly diffuse left ankle pain. He occasionally used a cane. He had not returned to work. His ankle pain was bad in the morning and he warmed up a bit as the day wore on, but worsened again at the end of the day. Examination revealed that he had limited motion of his ankle, tenderness along the anterior margin of the ankle joint as well as posteromedially and posterolaterally. He had a moderately antalgic gait. He reviewed numerous x-rays including both pre-injury and post-injury films. He stated that there was anterior osteophyte formation of the ankle of both the distal tibial plafond and the talar neck which were pre-existent. The posterior malleolus fracture had healed in a slightly proximal position. There was early and somewhat symmetric joint space narrowing. He responded to certain questions, which were asked of him. He stated that he did not believe that the anterior spur removal surgery

Lorenzo Guarino - 5

was causally related to the work injury. These spurs seemed to him to be pre-existent within a reasonable degree of medical certainty. He stated that if the spurs were going to be removed, he would also recommend arthroscopic evaluation for possible synovitis, which could be debrided at the same time. While he did not believe that spur removal was related to his injury he would consider that any synovitis in the ankle might be post-traumatic. It did not seem to him that the type of pain, which he was complaining of, was due to anterior impingement between the spurs on the tibia and talus. He felt that arthroscopy was a reasonable undertaking, but would not recommend getting anymore aggressive with this ankle. He also recommended a work hardening program but did not think that further PT at Donely Center was going to be helpful.

On 6/10/03, Dr. Fathallah performed arthroscopic surgery of his left ankle. According to the operative note, the interior of the joint revealed severe adhesions and synovitis of the entire joint medially and laterally. He mentioned that there was a large bony spur felt and seen, and confirmed with a C arm. He debrided the adhesions and synovium and excised the bone spur. Mr. Guarino followed-up on 6/19/03. The note stated that he was still sore but feeling better. He was going to start physical therapy. At his next visit on 7/10/03, the note states that he was still limping but doing better. His range of motion was improving. The note states that the doctor wanted him to continue PT and would see him again in one month.

I have not been provided with any medical records for the remainder of 2003 and all of 2004. It appears from Mr. Guarino's deposition that he was followed on an almost monthly basis by Dr. Fathallah. It sounds as if there was another arthroscopic procedure at some point in November 2004. No operative note has been provided. It is not clear whether this procedure included further debridement of bone spurs.

The next available medical records are from an operation, which Dr. Fathallah performed on 3/22/05. This procedure was done at Sturdy Memorial Hospital and according to the Operative Note, it was a left ankle fusion, which was done for a diagnosis of degenerative arthropathy of the left ankle. The fusion was internally fixed with two cannulated screws. Mr. Guarino remained in hospital for approximately a week. Pain management was an issue. There are no postoperative

notes describing his circumstances after the operation. The only additional material is the report of tomograms of the left ankle, which were done just about six months after the operation on 9/20/05. The note states that complete osseous fusion of the joint had not occurred. There was approximately 40% osseous fusion of the tibio-talar joint along the lateral aspect. The joint space was still clearly identified along the medial aspect. In addition, there were one or two tomographic sections where the joint space was still visible laterally. No additional medical records have been provided.

**DIAGNOSIS AND DISCUSSION:** Based upon the medical records, which have been provided, Mr. Guarino sustained a so-called Maisonneuve's fracture of the left ankle, which included a displaced posterior tibial malleolar fracture, a widened medial mortise, and a spiral mid-shaft fibular fracture as a result of the workplace fall on 2/5/02. It is important to note that the radiology report of a left ankle x-ray on 2/8/02, prior to the operation, reported a talar beak (osteophyte or bone spur) and some well corticated bone fragments near the anterior tibia. It would be very helpful to examine these films. The significance of these reported findings is that they are consistent with an old injury and with either some chronic arthritic changes at the ankle or talo-navicular joint or a tarsal coalition. Mr. Guarino required operative treatment of this fracture, which was carried out by Dr. Fathallah on 2/10/02. The surgery was appropriate and was causally related to the workplace injury, as was the operation to remove the screws some two months later. Once again, it would be helpful to review both the pre-operative and postoperative films to determine if there were any pre-operative degenerative changes or signs of remote trauma and also to confirm that the surgeon achieved a satisfactory congruous reestablishment of the ankle mortise as was suggested in his notes.

By June 2002, some four months after the accident, the claimant was complaining of anterior ankle pain, swelling, and limp, which Dr. Fathallah attributed to "a large spur anteriorly seen at the tibia." It is not clear that what he was referring to was a distal tibial spur or whether this was the "talar beak" on the neck of the talus described in the preoperative x-rays. Dr. Fathallah opined that the spur developed as a result of the fracture. However, I would emphasize that large spurs such as he described take very much longer then four months to develop following intra-

articular fractures. For these reasons, I would respectfully disagree with the surgeon, who attributes the development of the spur to the 2/5/02 fracture. Unless there is clear-cut radiological evidence that there was no evidence of any spur formation on the original x-ray, particularly on the films made on 2/5/02 and 2/8/02, it is my opinion that the spurs were pre-existing and were not causally related to the workplace accident. This opinion is supported by the report on the 2/8/02 ankle x-rays of a talar beak and what appeared to be some old healed avulsed bony fragments of the anterior end of the tibia. For this reason, it is my opinion that a causal relationship between the accident and the arthroscopic surgery to débride the tibial or talar spurs is simply not supported by the medical data. However, a diagnostic arthroscopy to evaluate and possibly treat ongoing ankle pain after an ankle fracture would have been a reasonable and appropriate strategy.

Based upon the 4/16/03 IME by Dr. Digiovanni, he reviewed several of the earlier x-rays and he described anterior osteophytes of both the distal tibia and talar neck, which he felt were chronic and pre-existing. Moreover, he described that there was a congruous mortise so that it would appear that the ankle surgery successfully re-established articular congruity of the widened mortise. The pre-existing tibio-talar degenerative changes are also supported by Dr Blazar's evaluation.

As far as one can tell from the limited medical data provided, his pre-existing ankle osteoarthritis, as was indicated by the tibio-talar spurs, progressed during 2003 and 2004 so that by March 2005, his surgeon felt that a fusion of the tibio-talar joint was appropriate. Unfortunately, the ankle fusion procedure performed on 3/22/05 has not seemed to consolidate and reports of tomograms on 9/20/05, six months after the operation, seems to indicate that he has gone on to a non-union. Again, no formal radiology reports have been made available. It would be helpful to review the actual ankle films in chronological sequence from the start up to the present time to get a true sense of the relationship between any pre-existing degenerative changes in the ankle, and the development of what appears to have been progressive arthritic changes subsequent to the work accident.

If the claimant has a non-union of his ankle fusion as appears to be the case, it is likely that he will still have significant ankle pain and require a re-do operation to treat the non-union. It does not appear that he was at a medical end result, at least at the time that the last medical records were made available. Assuming that a successful ankle fusion can be achieved, it can be expected to result in very significant pain relief and would not preclude an individual from full-time work in many occupations, which involve some standing and walking.

Based upon the limited medical data made available, it is my opinion that the claimant had some pre-existing arthritic changes in his left ankle, which were more likely then not aggravated to some extent by the ankle fracture. However, it is my opinion that in the absence of any pre-existing degenerative changes, this fracture treated by a successful operative reduction, which restored the congruity of the ankle mortise, which seems to have been the situation in this case, would not have resulted in progressive arthritic changes.

Very truly yours,

Hyman Glick, M.D.

Hyman Glick, M.D.
Board Certified Orthopedic Surgeon
(Guarino, L) w

APPENDIX  IIIA

## CURRICULUM VITAE – HYMAN GLICK, M.D.

**BORN:**            June 4, 1940, Montreal, Quebec, Canada

**EDUCATION:**       Bachelor of Science Degree
                     McGill University, 1961

                     M.D,C.M.
                     McGilL University Medical School 1965
                     Master of Science (Genetics)
                     McGill University, 1966

**INTERNSHIP:**      Jewish General Hospital, Montreal, Quebec
                     1965 – 1966

**RESIDENCIES:**     Junior Resident, General Surgery
                     Jewish General Hospital, Montreal, Quebec
                     1966 – 1967

                     Junior Resident, Orthopedic Surgery
                     Montreal General Hospital, Montreal, Quebec
                     1967 – 1966

                     Research Fellow, Orthopedic Research
                     Laboratories
                     Massachusetts General Hospital, Boston, MA
                     1968 – 1969

                     Harvard Medical School Combined Orthopedic
                     Residency Program
                     Boston, MA
                     1969-1972

                     Elective - Senior Orthopedic Resident
                     Rancho Los Amigos Hospital, Downey, CA
                     January - June, 1972

                     Chief Resident in Orthopedics
                     Massachusetts General Hospital1 Boston, MA.
                     July - December, 1972

Hyman Glick, M.D.
Page 2

**APPOINTMENTS:** Clinical instructor in Orthopedic Surgery
Harvard Medical School
1973 to present

Certified by American Board of Orthopedic
Surgeons, 1974

Fellow, American Academy of' Orthopedic
Surgeons, 1977

Attending Orthtopedic Surgeon
Beth Israel/Deaconess Hospital, Boston, MA
1973 to present

Staff Orthopedic Surgeon
Harvard Community Health Plan/Harvard
Vanguard Medical Associates, Boston, MA
1973 to present

Attending Orthopedic Surgeon
Brigham & Women's Hospital, Boston, MA
1987 to present

Courtesy Staff
Children's Hospital Medical Center, Boston, MA
1973 – 1985

Passed Voluntary Self Assessment Examination
American Academy of Orthopedic Surgeons
1984

Attending Orthopedic Surgeon
Parker Hill Medical Center
1973 - Closure In 1987

Attending Orthopedic Surgeon
Brookline Hospital
1973 - Closure in 1988

Hyman Glick, MD.
Page 3

Attending Staff: Orthopedic Surgeon
Hebrew Rehabilitation Center for the Aged
1980 to present

Attending Orthopedic Surgeon
New England Baptist Hospital
1999 to present

Attending Orthopedic Surgeon
Faulkner Hospital
2000 to present

Chief of Orthopedics
Harvard Vanguard Medical Associates
August 2000 to present

**PUBLICATIONS:**    Post traumatic Osteolysis of the Pubic Bone
Simulating a Malignant Lesion.
Journal of Bone and Joint Surgery 1984: 66A:
121 – 126

Bilateral Spontaneous Quadriceps Tendon
Ruptures.
Orthopedic Review 1984. 18(8):867-71.
Schwannoma of the Superficial Peroneal Nerve
Presenting as a Webspace Pain.
The Journal of Foot and Ankle Surgery, Vol 34,
(6) p. 532 - 533; 1995

Regarding Hyman Glick, M.D.
Pursuant to Fed. R. Civ. P 26(a) (B), the following is a list of cases in which
Dr. Glick testified as an expert at trial or by deposition within the past five years:

09/02/97 (Deposition)
Giovanni Recupero v. Certus, Inc. et al
Venue and docket number unknown
Requested by Gina T. Dussi, Esq.
Law Offices of Lawrence McAuliffe
3 Carlisle Road
Westford, MA 01886-0586

1/05/99 (Deposition)
Walter Strothman and Marvann Strothman v. Five Star Enterprises, Inc. and Marvann Strothman
Commonwealth of MA - Barnstable Superior Court
Docket No.: 97-516

4/26/99 (Video Deposition)
James M. Logan and Dawn Gaudette Logan v. Siebe Environmental Controls, ENE, Inc.
Commonwealth of MA - Suffolk Superior Court
Civil Action No.: 97-5574-A

3/1/2000 (Video Deposition)
Robert J. Dubroff, M.D. V. Trans-General Life Ins. Co., et al
United States District Court Cause No. CIV 99-00553 LCS/DJS

3/28/00 (Discovery Deposition)
Paul Reali v. Mazda Motor of America, et al
United States District Court of Maine
C.A. No.: 98-CV-358-P-H

6/6/00 (Video Deposition)
Richard Thompson v. Nynex Corp., n/k/a/ Bell Atlantic and Richard Macedo
Boston Municipal Court C.A. No. 9801ST-47150

2/9/01 (Video Deposition)
Sandra Puleio v. Sage Hotel Corp.
Commonwealth of MA, Worcester Department of Industrial Accidents
DIA# 023 23696

10/9/01 (Testimony at Arbitration)
Mark A. Mucciarone vs. Tracey K. Bigelow and Brian Bigelow
Wrentham District Court; Docket No.: 0057 CV 699

9/20/02 (VideoDeposition)
Maria Delegas vs. Jessica A. Blagg, Lucas F. Turton and Liberty Mutual Ins. Co.
Suffolk Superior court C.A. No.: 99-5652E

9/12/2003 (VideoDeposition)
Thomas Bartkowiak V. Black & Veatch Construction, Inc.
Hampden Superior Court CA. No.:2001-00825


1/13/2004 (Video Deposition)
Saralee Haskins V. Richard A. Howard, Individually and as Trustee of Howard
Properties Limited Partnership
C.A.#: 01-5449


4/7/2004(Video Deposition)
Valerie I. Bryant and Mary A. Guerin v. Northland Investment Corp. and Otis Elevator
Company
Middlesex Superior Court C.A.#: 01-5605


9/27/04 (Arbitration Hearing Testimony)
R. Harris, Jr. v. John Doe, Polar Corporation and Liberty Mutual Insurance Co.
C.A. #: 2001-2606C